UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| WINDY BULLARD SUGGS,<br>      Plaintiff,<br><br>-vs-<br><br>MARTIN O'MALLEY[1],<br>Commissioner of Social Security<br>Administration,<br><br>      Defendant. | Civil Action No.: 4:23-cv-00848-TER<br><br><br>ORDER |

  This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits(DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

### I. RELEVANT BACKGROUND

**A. Procedural History**

  Plaintiff filed an application for DIB in July 2020, alleging inability to work since April 28, 2016. (Tr. 16). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held in July 2022 at which time Plaintiff and a vocational expert (VE) testified. The Administrative Law Judge (ALJ) issued an unfavorable decision on August 26, 2022, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 16-27). Plaintiff filed

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), he is automatically substituted for Defendant Kilolo Kijakazi who was the Acting Commissioner of Social Security when this action was filed.

a request for review of the ALJ's decision, which the Appeals Council denied in January 2023, making the ALJ's decision the Commissioner's final decision. (Tr.1-3). Plaintiff filed an action in this court in March 2023. (ECF No. 1).

Important here, Plaintiff was represented by an attorney and non-attorney representative at the hearing. Three days after the hearing, only the attorney withdrew. Nonattorney Youngman remained as Plaintiff's representative on the claim and as a payee. (Tr. 170). The Appeals Council mailed its notice to Youngman. (Tr. 1). At the hearing, the record was left open for a limited time for records that were already paid for from Dr. Engelman; this is not at issue in Plaintiff's brief. (Tr. 35).

### B. Plaintiff's Background

Plaintiff was born in July 1965 and was fifty-five years old at the DLI. (Tr. 64). Plaintiff has past relevant work experience as a employment training specialist and legal assistant/paralegal. (Tr. 26). Plaintiff alleges disability originally due to rheumatoid arthritis, knees, fingers, DDD-disc protrusion/bulge neck, lower back, GERD, panic, and migraines. (Tr. 64). Pertinent medical records will be discussed under the relevant issue headings.

### C. The ALJ's Decision

In the decision of August 26, 2022, the ALJ made the following findings of fact and conclusions of law (Tr. 16-27):

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 28, 2016 through her date last insured of September 30, 2020 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: fibromyalgia, degenerative joint disease, degenerative disc disease, and obesity (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b). Light exertional work is described by the Commissioner of the Social Security Administration as requiring lifting and carrying of up to 20 pounds occasionally and 10 pounds frequently and standing, walking, and sitting for 6 hours in an 8-hour workday. The claimant can never climb ladders, ropes, or scaffolds, but can perform other postural movements occasionally. She can perform frequent, but not constant, handling and fingering. She must avoid exposure to extreme cold.

6. Through the date last insured, the claimant was capable of performing past relevant work as an employment training specialist, Dictionary of Occupational Titles (DOT) #094.224-022, SVP 6, skilled, light exertional work and legal assistant/paralegal, DOT #119.267-026, SVP 7, skilled, light exertional work. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 28, 2016, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(f)).

## II. DISCUSSION

Plaintiff argues the ALJ's RFC is unsupported because there is no medical opinion about limitations/abilities in the 662 page record. The Commissioner argues that the ALJ's decision is supported by substantial evidence.

**A.    LEGAL FRAMEWORK**

   **1.    The Commissioner's Determination–of–Disability Process**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing SGA. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     **The Court's Standard of Review**

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th

Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.     ANALYSIS**

**RFC**

Plaintiff argues the ALJ's RFC is unsupported because there is no medical opinion about Plaintiff's limitations/abilities in the 662 page record.

An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). In making that assessment, she must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2. This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8, *7. The RFC is an administrative

assessment made by the ALJ based on all the evidence, which includes opinions from medical sources about what the individual can still do if such opinions are present in the record. *See* SSR 96-8p. An ALJ must explain why an opinion is not adopted. SSR 96-8p.

The ALJ considered the following evidence when determining the RFC of:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b). Light exertional work is described by the Commissioner of the Social Security Administration as requiring lifting and carrying of up to 20 pounds occasionally and 10 pounds frequently and standing, walking, and sitting for 6 hours in an 8-hour workday. The claimant can never climb ladders, ropes, or scaffolds, but can perform other postural movements occasionally. She can perform frequent, but not constant, handling and fingering. She must avoid exposure to extreme cold.

(Tr. 21-22). The ALJ considered Plaintiff's testimony that her last job was in 2016 in vocational rehabilitation, training people for job interviews. Plaintiff reported she stopped working due to pain and difficulty sitting and standing for extended periods. (Tr. 22). Plaintiff reported she had difficulty writing and using a computer. Plaintiff reported migraines. (Tr. 22). At the hearing, the ALJ noted there was no imaging in the file. (Tr. 22)(later in the ALJ's opinion, imaging is discussed, 24). Plaintiff reported she elevated her legs daily due to knee swelling. (Tr. 22). Plaintiff reported during the relevant time period, she occasionally used a cane for ambulation. (Tr. 22-23). Plaintiff reported she could stand for 2-3 minutes in 2016. (Tr. 23). Plaintiff testified she could do chores for about 5-10 minutes at a time. Plaintiff reported she had migraines since childhood and that in 2016 she had 3-4 a month with a 24 hours recovery time needed after a migraine. (Tr. 23). At the hearing, the ALJ pointed to Plaintiff providing all of her mother's care. Plaintiff testified her mother died in 2017 and there were others that assisted with transfers and nursing came to her mother's home to perform some of the care. (Tr. 23).

The ALJ discussed the record in detail with citations to individual pages of the record as to

7

Plaintiff's fibromyalgia(FM) and pain from 2015-2020:

> Regarding the claimant's fibromyalgia, hospital records dated March 2015 showed the claimant was assessed with fibromyalgia and chronic pain (Exhibit B5F/88-104). Treatment notes dated October 2016 from Dr. C. Gregory Kang of Pain, Spine, and Sports Medicine noted the claimant reported being diagnosed with fibromyalgia syndrome in the 1990s. The claimant reported pain rated as 6/10. On exam, he found 18/18 abnormal tender points. He assessed fibromyalgia syndrome (Exhibit B1F/147-148). In February 2017, the claimant noted she was helping take care of her mother as well as prepare meals for her mother and family. She rate pain levels as 6/10. On exam, Dr. Kang noted tenderness over the left shoulder and tenderness over the right hip with decreased range of motion. He noted discomfort down the left upper extremities and bilateral lower extremities. Diagnosis was unchanged (Exhibit B1F/74-75). In April 2017, The claimant reported pain levels of 7/10 in her neck, shoulder, and lower back. However, she advised Dr. Kang that she was still taking care of her parents and "pretty much gives them total care." He noted 18/18 tender points, but not gross motor or sensory deficits. He assessed fibromyalgia syndrome (Exhibit B1F/72-73). In December 2019 and January 2018, the claimant noted she was able to perform driving, shopping, cooking, and household chores, but noted tenderness in her neck and lower back as well as her right hip. She was assessed with fibromyalgia (Exhibit B1F/40-41). In August 2018 and November 2018, the claimant was noted to exhibit tenderness in the shoulders, neck and back, arms, hands, wrists, fingers, and knees. Swelling in the knuckles of the hands were noted (Exhibit B1F/23-30). In January 2019 and March 2019, the claimant reported cold weather was exacerbating her pain symptoms. However, she noted she was assisting in the care of her father-in-law as well (Exhibit B1F/21). In May 2019 and February 2020, tenderness in the upper back, shoulders, upper arms, hands, fingers, right hip and left knee were found. The claimant was noted to exhibit discomfort with weightbearing and reported discomfort down both arms bilaterally as well as pain down both legs below, but without focal deficits. Diagnoses remained fibromyalgia and chronic pain syndrome (Exhibit B1F/5-7, 17).

(Tr. 23-24).

The ALJ then discussed Plaintiff's arthritis/osteoarthritis/degenerative joint disease beginning in 2018 through 2019. (Tr. 24). Throughout this impairment discussion, the ALJ cited to various specific page numbers of Exhibit B1F, pain management treatment notes from 2016-2020, Exhibit B5F, 2015 to 2019 hospital records, and Exhibit B2F, 2019 to 2022 hospital records. (Tr. 24). In January 2018, Plaintiff was diagnosed with right hip bursitis by Dr. Kang after Plaintiff examined with decreased range of motion, spasms, tender to palpation, and ambulates without difficulty. (Tr. 24, 342).

Back and leg pain had fair control with medications, but Plaintiff had increasing right hip pain that morphine did not seem to be helping; "both of her parents have not passed away." (Tr. 342)(it is unclear based on other treatment notes, if this was a typographical error and intended to be "now" instead). Plaintiff received fentanyl patch and percocet refills. Plaintiff was referred to a spine surgeon. Plaintiff's right hip was injected. (Tr. 343). The ALJ noted at the June 2018 pain management visit, Plaintiff examined with tenderness in the knees but ambulated without difficulty. (Tr. 24, 335). "Medication regimen makes it possible for the patient to prepare meals, go shopping, and keep her house clean." (Tr. 335). Under treatment plan, Dr. Loskill, of the same practice as Dr. Kang, noted "no signs of medication abuse or diversion, no evidence of impairment." (Tr. 336).

The ALJ reviewed August 2018 treatment notes. (Tr. 24, 332). Plaintiff examined with tenderness in cervical paraspinal muscles, decreased neck range of motion, ambulates without difficulty, and tenderness in shoulders, arms, right hand and wrist, and knees. (Tr. 332). Plaintiff reported a pain level of ten. Plaintiff reported difficulty walking but did not examine with that. Dr. Loskill stated: "pain medications help take the edge off the pain and she's able to continue some of her regular activities including light housekeeping and helping with meals." (Tr. 332). Opioids were refilled due to functional benefits. (Tr. 333).

In August 2018, Plaintiff was seen in the emergency room and assessed with left knee sprain and edema. (Tr. 24, 581). Plaintiff reported she recently starting work with a new employer. (Tr. 24, 583). Plaintiff reported taking over-the-counter Motrin with some relief. It is unclear whether Plaintiff reported medications of fentanyl and percocet to the emergency room providers. (Tr. 583). Imaging showed mild DJD of left knee. (Tr. 586).

In March 2019, Plaintiff examined with hip and shoulder tenderness and antalgic gait. (Tr. 24,

9

323). Plaintiff reported her pain going from a nine to a 4-7 with medication. Dr. Loskill stated: "The medications allowed her to drive, go shopping, and take care of her home." (Tr. 323).

In November 2019, Plaintiff was seen in the emergency room and examined with significant effusion and significant peripatellar and retropatellar tenderness with imaging of mild to moderate degenerative joint disease in right knee without fracture or misalignment. (Tr. 24, 511, 553). Plaintiff reported she had been told her left knee needed replacing, but her right knee had worsening pain for a week. (Tr. 510). It is unclear whether Plaintiff reported percocet and fentanyl as medications to the emergency room. (Tr. 510). Plaintiff was instructed on low stress, knee workout options so "that she may be able to lose some weight to lessen daily impact on knees. (Tr. 511). NSAIDs and topical medications were prescribed. (Tr. 511).

The ALJ noted in December 2019, Plaintiff reported to Dr. Loskill she had a recent arthrocentesis after a knee pain flare up. (Tr. 24, 312). At the visit, Plaintiff was still a little flared up with the weather changing. (Tr. 312). Plaintiff examined with antalgic gait, tenderness, and decreased range of motion. (Tr. 312).

The ALJ then discussed records as to cervical spine disease and pain beginning in March 2015, with Plaintiff's first diagnosis being in 2015. (Tr. 24, 635-651). In the fall of 2016, Dr. Kang noted a 2013 accident resulted in C7 fracture and lumbar herniations, but Plaintiff had refused surgery. (Tr. 24, 451). Plaintiff had pain with radiation into arms and leg. (Tr. 24, 451). Plaintiff reported in the past, her family practitioner prescribed Oxycontin, and the last year, she had been on 100mcg fentanyl patches and taking Oxycodone six times a day. Plaintiff reported the medications allowed her to care for her mother full-time who had a stroke. (Tr. 24, 451). Plaintiff had been discharged by her other provider because she was late and she had not had a patch in five days and was having some

10

withdrawal. (Tr. 24, 451). At a 2016 exam with Dr. Kang, Plaintiff had ambulation without difficulty and 5/5 strength. (Tr. 24, 451). Plaintiff was prescribed fentanyl patches, percocet, and gabapentin with a goal to decrease opioids. (Tr. 452). Plaintiff had multiple injections in her back and neck in 2016 and 2017. (Tr. 24, 355, 368, 383, 402, 406, 430).

Along with the plethora of treatment notes, the ALJ discussed October 2016 lumbar MRI findings from Dr. Russell L. Derrick, M.D. of minimal edema and stress related and diffuse degenerative disc disease with foraminal narrowing. (Tr. 24, 631-632). The 2016 cervical MRI showing high grade exit foraminal stenosis at C5-C7 was not significantly changed from 2013, when Plaintiff was working. The "not significantly changed" language is directly from Dr. Brian Trotta, M.D. and not the ALJ. (Tr. 634). There was worsened left sided facet arthropathy at C3-C4 with moderate left exit foraminal stenosis. (Tr. 24, 634). Pertinent to Plaintiff's arguments, the ALJ repeated the findings by the radiologists from the MRI impressions; the ALJ did not interpret raw images into his own findings. *See Pace v. Saul,* No. 6:19-CV-01186-DCN-KFM, 2020 WL 6111000, at *7 (D.S.C. Oct. 16, 2020), *aff'd sub nom.* 2022 WL 3334628 (4th Cir. Aug. 12, 2022*)*(noting the ALJ's consideration of MRI findings and merely repeating conclusions articulated by professionals in the record was not "improperly interpreting raw MRI data"); *Jones v. Colvin*, No. 9:14-cv-4339-TMC-BM, 2016 WL 1054991, at *5 (D.S.C. Mar. 17, 2016)(the ALJ's discussion mirroring the findings of the MRI report was not improperly interpreting medical data); *Derrick W. v. Kijakazi*, 2022 WL 488067, at *5 (W.D. Va. Feb. 17, 2022), *report and recommendation adopted*, 2022 WL 780416 (W.D. Va. Mar. 14, 2022)(same); *Harvey v. Comm'r of Soc. Sec. Admin.*, No. 9:20-CV-00135-TMC-MHC, 2021 WL 3410758, at *6 (D.S.C. May 18, 2021), *report and recommendation adopted sub nom.*, 2021 WL 3012641 (D.S.C. July 16, 2021)(an ALJ relaying conclusions from an MRI report is not the

interpretation of raw medical data).

The ALJ reviewed treatments notes where Plaintiff reported in February 2017, she was helping care for her mother and prepare meals and was able to do so with her medications. (Tr. 24, 378). Plaintiff reported some relief with injections. (Tr. 378). Plaintiff examined as ambulating without difficulty despite complaints of leg discomfort. (Tr. 24, 378). The provider noted "remains functional on medications." (Tr. 379). (The ALJ states this is Dr. Kang's exam but it appears Dr. Loskill signed the note). (Tr. 379).

The ALJ reviewed April 2017 treatment notes where Plaintiff reported pain in her neck, shoulder, and back. (Tr. 25, 376). Plaintiff reported inadequate pain control, that oxycodone no longer helped, and as to her parents, "she pretty much gives them total care." (Tr. 376). Plaintiff examined with 18 of 18 tender points, decreased range of motion, and spasm. Plaintiff ambulated without difficulty. (Tr. 376). Plaintiff's medication was changed to "morphine sulfate" for break through pain; fentanyl was refilled. (Tr. 377).

The ALJ reviewed May 2017 treatment notes. (Tr. 25). In May 2017, Plaintiff reported the new morphine gave her a little bit better pain coverage and allowed her to continue with routine activities, like helping her mother. (Tr. 25, 374). While the ALJ stated "the physical exam was unremarkable," this exam was similar to past exams with tenderness, decreased range of motion, 5/5 strength, and ambulates without difficulty. (Tr. 25, 374). In July 2017, Plaintiff reported she was doing "a lot of lifting, pulling, and taking care of her dependent parents," which was contributing to her pain. (Tr. 25, 350). Plaintiff reported fair pain control. Similar to May 2017, the ALJ stated the July 2017 exam was unremarkable, but it was the same as the May exam, having some abnormal findings and some normal findings. (Tr. 25, 350). Dr. Kang noted "she is not in a position to get back surgery because she has to

12

take care of her parents, remains functional on medications." (Tr. 350).

The ALJ continued to review treatment notes from the fall of 2017 forward to January 2022. (Tr. 25). In September 2017, Plaintiff was seen by Dr. Kang and reported she had "adequate pain control" and "is taking care of her elderly mother who is completely dependent for self care activities of daily living, transfers, and hygiene." (Tr. 25, 348). Plaintiff reported radiating pain in her right leg, neck, and shoulder, but Plaintiff stated she could not have surgery because she has to take care of her mother. (Tr. 25, 348). Plaintiff examined as ambulates without difficulty, 5/5 strength, and normal range of motion without pain or crepitus. (Tr. 25. 348). Dr. Kang's diagnosis were cervical degenerative disc disease and lumbar degenerative disc disease with radiculitis. (Tr. 25, 349). Dr. Kang prescribed fentanyl patch, morphine sulfate, movantik for opioid induced constipation, and subcutaneous naloxone with a discussion about opioid reversal therapy. (Tr. 349). Plaintiff "remains functional on medications." (Tr. 349).

The ALJ reviewed October 2017 treatment notes. (Tr. 25). Plaintiff reported constant pain, worse with activity. (Tr. 346). Plaintiff reported her mother had passed away and she had been "the main caregiver for her." (Tr. 25, 348). Dr. Loskill stated: "The pain medications make it possible for the patient to be able to do her laundry, cook meals, and do the dishes." (Tr. 348). Plaintiff's pain level was 5-6. (Tr. 25, 348). Plaintiff examined with tenderness in the neck muscles, ambulates without difficulty, normal range of motion without pain or crepitus, 5/5 muscle strength, and neurologically discomfort down left arm and right leg. (Tr. 346). Plaintiff "remains functional on the medications." Dr. Loskill discussed with Plaintiff that "she is at elevated risk for multiple side effects based on her amount of opioids." (Tr. 347). Plaintiff agreed that the benefit outweighed the risk of that level of opioids because she was "able to function and continue daily living activities." (Tr. 347).

13

The ALJ reviewed January 2018 treatment notes and noted additional diagnosis of multilevel lumbar degenerative disc disease and fracture of the neck, unspecified sequela. (Tr. 25, 343-345). At that visit Plaintiff reported morphine did not seem to be helping very well. (Tr. 343). Upon exam, Plaintiff ambulated without difficulty, had decreased range of motion, spasms, and tenderness to palpation. (Tr. 343). Plaintiff was referred to a surgeon and her right hip was injected. (Tr. 343).

In March 2019, Dr. Loskill noted the claimant reported a decrease in pain levels of 6/10 from 9/10 with the use of prescribed medications. (Tr. 25, 323). The ALJ discussed that upon exam, Plaintiff had antalgic gait, tenderness, and reduced range of motion. (Tr. 25, 323). In July 2019, Plaintiff reported to Dr. Loskill that she had pain level of 10 after picking tomatoes a couple of days prior. When Plaintiff is "not flared up," medications can bring down her pain to 55%, going to between a four and a seven. Medications "allow her to drive, do light chores around the house, and make it to her doctor appointments." (Tr. 25, 318). At this appointment, Plaintiff examined with antalgic gait, tenderness, decreased range of motion, and discomfort neurologically. (Tr. 318). Plaintiff "remains functional on medications." (Tr. 319). The ALJ noted that in February 2020, diagnoses remained other intervertebral disc displacement, lumbosacral region, unspecified cervical disc degeneration, and lumbosacral region radiculopathy, citing Dr. Loskill's notes. (Tr. 25, 310).

The ALJ noted Plaintiff went to the emergency room in January 2022 for lower abdominal pain and Plaintiff denied neck, back, or joint pain. (Tr. 25, 488). Plaintiff checked her self out against medical advice. (Tr. 483). Plaintiff was assessed with myalgias and was covid-19 positive. The ALJ noted Plaintiff's motor strength was 5/5. (Tr. 25, 488). The ALJ stated "multiple attempts were made by hospital staff to convince the claimant to stay for evaluation and treatment, but she refused. It was noted that the claimant had a capacity to give, receive, and withhold information." (Tr. 25).

The ALJ found the RFC was based on all the foregoing records discussed by the ALJ, supported by Plaintiff's activities prior to the DLI, and from support of the medical evidence. (Tr. 25). The ALJ found there was little evidence supporting Plaintiff's alleged significant manipulative limitations and the RFC accounted for conditions that exacerbated FM. (Tr. 25).

The ALJ clearly acknowledged "[t]here are no opinions regarding functional limitations from any treating sources." The ALJ found the state agency consultants' statements unpersuasive. The state agency consultants had stated there was insufficient evidence of severe impairments before the DLI. (Tr. 26). Exhibits B1A and B5A cited by the ALJ were the nonexamining statements noting exams and diagnosis in the records. However, the consultants then stated "unable to get functional information or missing source information" and thus the consultants found "insufficient evidence to assess the severity of impairments." (Tr. 56-57). The exhibit shows DDD was found as a severe impairment though. (Tr. 57). The ALJ found there were more severe impairments: fibromyalgia(FM), degenerative joint disease, degenerative disc disease, and obesity. (Tr. 19). The ALJ noted he found those nonexamining statements unpersuasive because the record in fact included objective imaging of Plaintiff's cervical spine, lumbar spine, and right knee, and moreover, there were treatment notes regarding FM and obesity prior to the DLI of September 2020. (Tr. 26).

Plaintiff asserts that an ALJ cannot review the record to formulate an RFC where no medical provider has reviewed the record and provided functional limitation opinions. (ECF No. 16 at 12-13)("If we let ALJ's get away with concocting RFCs as the ALJ did in this case, there is no point to medical opinion evidence...."). Plaintiff also appears to be requesting a consultative exam. (ECF No. 16 at 17).

"The key consideration is 'whether the record contained sufficient medical evidence for the ALJ to make an informed decision' regarding the claimant's impairment." *Lehman v. Astrue*, 931 F. Supp.

15

2d 682, 692–93 (D.Md. 2013) (quoting *Craft v. Apfel*, No. 97-2551, 1998 WL 702296 (4th Cir. 1998)). Notably, an "ALJ is under no obligation to supplement an adequate record to correct deficiencies in a plaintiff's case." *Id.* at 693. Further, "[a] lack of opinion evidence from a treating physician does not ... necessarily trigger a duty to develop the record," particularly when the claimant is represented by counsel." *Id.* at 694; *Hughes v. Kijakazi*, No. 5:21-cv-905-KDW, 2022 WL 3714627, at *12 (D.S.C. Aug. 29, 2022). At the hearing, Plaintiff's attorney was present. The only mention of a record completion issue was outstanding evidence from Dr. Engelman and the ALJ left the record open to receive that information. (Tr. 35). The ALJ gave Plaintiff's attorney an opportunity at the end of the hearing to provide any further argument, questions, or statements. (Tr. 51). Plaintiff's attorney never asked for a consultative exam or expressed any concern at the hearing before the ALJ that the record was without any medical opinions. Plaintiff's attorney did not express concern that the state agency consultants never opined about Plaintiff's functioning. (Tr. 51). An ALJ does not act as substitute counsel for a claimant and the ALJ is entitled to assume Plaintiff's attorney is making his strongest case for benefits. *Helton v. Kijakazi*, 2022 WL 3031345, at *6 (W.D. Va. Aug. 1, 2022), *report and recommendation adopted*, 2022 WL 4003870 (W.D. Va. Sept. 1, 2022). "[T]he regulations require only that the evidence be complete enough to make a determination regarding the nature and severity of the claimed disability, its duration, and the claimant's RFC." *Id.* (internal citations and quotations omitted); *See also Webb v. Berryhill,* 2018 WL 2198829, at *12 (M.D.N.C. May 14, 2018), *report and recommendation adopted*, 2018 WL 2583113 (M.D.N.C. June 4, 2018) ("Having failed to raise the issue of missing opinion evidence at the hearing, Plaintiff cannot wait until after the ALJ issues his decision to challenge the ALJ's development of the record."). An ALJ is only required to seek additional or clarifying information in the record if the record is inadequate to determine whether

Plaintiff is disabled. 20 C.F.R. § 404.1520b. Even where inconsistent evidence is presented in the record, the ALJ has the discretion to make a determination based on the evidence before him. Having found sufficient evidence to make an informed decision regarding Plaintiff's condition and having cited to such evidence to enable the court to meaningfully review his decision, the ALJ was under no obligation to obtain additional information.

Reviewing the record as discussed above, the ALJ had sufficient evidence before him to render a disability determination. Plaintiff had imaging, emergency room visits, and regularly visited providers, who examined her, documented her subjective contemporaneous reports and complaints, and noted regularly how medications made her functional with very little side effects. An RFC is "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." *Felton-Miller v. Astrue*, 459 Fed. Appx. 226, 230-31 (4th Cir. 2011)(citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). To determine the RFC, a provider's opinion is not required. The ALJ forms the RFC from the record as a whole and the ALJ discussed and reviewed the record in sufficient detail for the court to meaningfully review whether it was supported. *See* SSR 96–8, *7; *Craig*, 76 F.3d at 595. Where a plaintiff argued an ALJ erred by reviewing medical evidence as a layperson and wanted the RFC set aside because there was no medical opinion in the record, the Fourth Circuit Court of Appeals found such argument "misapprehends the agency's administrative review process" and an RFC is "an agency-conducted administrative assessment that considers all relevant record evidence." *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022); *Felton-Miller v. Astrue,* 459 Fed. Appx. 226, 230 (4th Cir. 2011)(finding the same, the argument that the ALJ as a layman cannot formulate an RFC without an expert medical opinion is without merit).

Under the deferential standard of review applicable here, substantial evidence is not a high

17

threshold. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The ALJ here performed the analysis under the applicable regulatory scheme. The ALJ supported the RFC found with a thorough discussion of the record. The ALJ explained the weight given to the nonexamining opinions.

### III. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

February 26, 2024  
Florence, South Carolina

s/ Thomas E. Rogers, III  
Thomas E. Rogers, III  
United States Magistrate Judge